# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SMURFIT-STONE CONTAINER CORPORATION, et al.,[1]<br><br><div align="center">Debtors.</div><br>SMURFIT-STONE CONTAINER CORPORATION, et al.<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br><br>MARK W. MAYER, LARRY C. WELSH AND BRANDI YOUNG, INDIVIDUALLY, ON BEHALF OF THE SMURFIT-STONE CONTAINER CORPORATION SAVINGS PLAN, THE JEFFERSON SMURFIT CORPORATION HOURLY SAVINGS PLAN, THE SMURFIT-STONE CONTAINER CORPORATION HOURLY SAVINGS PLAN, AND THE ST. LAURENT PAPERBOARD HOURLY SAVINGS PLAN, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br><div align="center">Defendants.</div> | Chapter 11<br><br>Case No. 09-10235 (BLS)<br><br>Jointly Administered<br><br>Adv. Pro. No. 09-51067 (BLS) |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 150 North Michigan Avenue, Chicago, Illinois 60601.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION

The above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), through their attorneys, hereby submit this Memorandum of Law in Support of their

Motion for Temporary Restraining Order and Preliminary Injunction against Defendants Mark

W. Mayer, Larry C. Welsh and Brandi Young and all others whom Defendants purport to

represent (collectively, the "Defendants"), pursuant to sections 362(a) and 105(a) of title 11 of

the United States Code (the "Bankruptcy Code") and Fed. R. Bankr. Pro. 7065, the Bankruptcy

Court's procedural mate to Fed. R. Civ. Pro. 65. In further support of this Motion, Debtors

submit the Declaration of Craig A. Hunt, attached as Exhibit A hereto.

## INTRODUCTION

Debtors seek to enjoin separately brought legal proceedings (the "ERISA

Lawsuit") brought by the Defendants herein against certain indemnified key executives of the

Debtors. As explained more fully below, Debtors currently are approaching a critical stage of

their bankruptcy proceedings. These jointly-administered cases consist of twenty-five (25)

individual Debtors operating one of the leading paperboard and paper-based packaging

manufacturers in North America, with significant cross-border operations and a complex capital

structure. The Debtors operate 162 manufacturing facilities in North America and China and

employ more than 21,000 people. Their revenues for the fiscal year ending December 31, 2007

exceeded $7.4 billion. Since filing for bankruptcy on January 26, 2009 (the "Petition Date"), the

Debtors have worked diligently to obtain debtor-in-possession financing ("DIP Financing") on a

final basis, addressed immediate cash management concerns, established relationships with the

various creditor constituencies in their bankruptcy proceedings, including the Official Unsecured

2

Creditors Committee (the "Committee"), and filed numerous motions and satisfied various administrative requirements in order to acclimate their business operations to, and begin to establish a framework for emerging from, their chapter 11 cases. In order to successfully reorganize, the Debtors are now turning their attention to examining their business model and long-term business plan, and toward developing a plan of reorganization that will allow them successfully to emerge from bankruptcy and to thrive thereafter.

At this critical juncture, however, the three named Defendants, acting as Plaintiffs purportedly on behalf of themselves, four retirement savings plans of the Debtors (collectively the "Plans"), and a class that could include thousands of others who participated in these plans (the "ERISA Plaintiffs"), have brought an ERISA action (the "ERISA Lawsuit") in the United States District Court for the Northern District of Illinois (Case No. 09-CV-2984). The ERISA Plaintiffs did not name the Debtors directly as defendants, but they have instead named the Debtors' Chief Executive Officer ("CEO") and the Administrative Committee of the Debtors' benefits plans and its individual members (the "ERISA Defendants"), all of whom are key executives and officers of the Debtors and deeply engaged in bankruptcy-related work on the Debtors' behalf.

The allegations in the ERISA Lawsuit are extensive and complex. The Complaint is 49 pages long, and includes four distinct counts and 169 numbered paragraphs. The ERISA Plaintiffs assert that the ERISA Defendants breached their fiduciary duties to the Plans and to the ERISA Plaintiffs over a course of more than a year, purportedly costing the Plans many "millions of dollars" in resulting losses. The ERISA Plaintiffs will undoubtedly seek broad discovery regarding these allegations, as their claims depend on deeply factual questions of what was known, at what points in time, by whom, what was done as a result, and why.

DB02:8321757.1

068063.1001

Such a Lawsuit at this time threatens the Debtors' ability successfully to reorganize. Due to strong indemnification requirements, whatever recovery the ERISA Plaintiffs may ultimately be awarded will be the Debtors' responsibility. According to the ERISA Plaintiffs, this recovery may be "millions of dollars," potentially exceeding, and certainly diminishing, the Debtors' available insurance coverage. Moreover, due to the inevitably large amount of discovery that will be required as part of the ERISA Lawsuit, participating in that process will necessitate the expenditure of a tremendous amount of time and resources from the very executives integral to the development of the Debtors' plan of reorganization.

In order to prevent the usurping of estate resources and the human resources of the Debtors' key executives during the course of a reorganization, it is well established that the Automatic Stay (defined below) may be extended to encompass non-debtor third parties, especially where, as here, due to indemnification requirements the Debtor is the real party in interest in the outside litigation and where the individual defendants play such a significant role in furthering the Debtors' efforts to reorganize that diverting their attention in order to defend the lawsuit would hinder those efforts. Accordingly, the Debtors seek an order extending the Automatic Stay to enjoin proceedings in the ERISA Lawsuit to help prevent any further distraction from the Debtors' most pressing task, namely preserving the assets of their estates for all stakeholders in their chapter 11 cases while developing a plan of reorganization to allow the Debtors successfully to emerge.

## STATEMENT OF FACTS

On the Petition Date, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. VC ¶ 5.[2] On January 27, 2009, the Court entered an order

---

[2]Citations to "VC ¶ __" refer to paragraphs of the Verified Complaint filed by the Debtors in this Adversary Proceeding. Citations to "Dec. ¶ ____" are to the Declaration of Craig A. Hunt.

consolidating the Debtors' chapter 11 cases for procedural purposes only, and they are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). VC ¶ 5. The Debtors have continued in possession of their respective properties and have continued to operate and maintain their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. VC ¶ 6. On February 5, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee. VC ¶ 7. No request has been made for the appointment of a trustee or examiner. VC ¶ 7.

**BACKGROUND OF THE DEBTORS**

Smurfit-Stone Container Corporation ("SSCC") is a holding company that conducts its business operations through its wholly-owned subsidiary Smurfit-Stone Container Enterprises, Inc. ("SSCE"), the surviving entity from the November 1998 merger of Jefferson Smurfit Corporation and Stone Container Corporation. VC ¶ 1; Dec. ¶ 3. SSCE is the direct or indirect parent company of all of the other Debtors and their respective non-debtor affiliates (collectively with SSCC and SSCE, the "Company"). VC ¶ 1; Dec. ¶ 4. The Company is one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and is one of the world's largest recyclers of paper. VC ¶ 2; Dec. ¶ 5. The Company sells a broad range of paper-based packaging products, including containerboard, corrugated containers, kraft paper, and point of purchase displays, to a broad range of manufacturers of industrial and consumer products. VC ¶ 2; Dec. ¶ 5.

The Company operates 162 manufacturing facilities that are primarily located in the United States and Canada, including 14 paper mills (12 in the United States and 2 in Canada), 122 container plants (102 in the United States (including 1 in Puerto Rico), 16 in Canada, 3 in Mexico, and 1 in China), and 26 reclamation plants (all in the United States). VC ¶

3; Dec. ¶ 6. The Company also owns approximately one million acres of timberland in Canada and operates wood harvesting facilities in Canada and the United States. VC ¶ 3; Dec. ¶ 6. The Company employs approximately 21,250 employees, of whom approximately 17,410 are based in the United States. VC ¶ 3; Dec. ¶ 6. For the fiscal year ended December 31, 2007, the Company recorded revenues of approximately $7.420 billion, resulting in a net loss of approximately $115 million for fiscal year 2007. VC ¶ 3; Dec. ¶ 7. For the quarterly period ended September 30, 2008, the Company reported approximately $7.450 billion in total assets and $5.582 billion in total liabilities on a consolidated basis. VC ¶ 3; Dec. 7.¶

The Company's financial performance depends primarily upon the market demand for its products and the prices that it receives for such products. VC ¶ 4; Dec. ¶ 8. The recent downturn in the global economy has resulted in an unprecedented decline in demand for the Company's products, leading to increased inventory levels and downward pressure on the Company's operating income. VC ¶ 4; Dec. ¶ 8. At the same time, substantial price competition and volatility in the pulp and paper industry has resulted in decreased prices for the Company's products which, coupled with the Company's leveraged financial position and the recent volatility in energy prices and the cost of raw materials, have adversely impacted the Company's financial performance. VC ¶ 4; Dec. ¶ 8. In addition, recent and dramatic changes in the capital markets have adversely impacted the Company's prospects for refinancing its revolving credit and securitization facilities. VC ¶ 4; Dec. ¶ 8. Because of these factors, the Debtors have found it necessary to commence these chapter 11 cases. VC ¶ 4; Dec. ¶ 8.

**BACKGROUND OF THE ERISA LAWSUIT**

On May 18, 2009, Plaintiffs Mark W. Mayer, Larry C. Welsh, and Brandi Young, on behalf of themselves, and purportedly on behalf of the Smurfit-Stone Container Corporation Savings Plan, the Jefferson Smurfit Corporation Hourly Savings Plan, the Smurfit-Stone

DB02:8321757.1

068063.1001

Container Corporation Hourly Savings Plan, and the St. Laurent Paperboard Hourly Savings Plan, and on behalf of all others similarly situated, filed their 49-page, four count, 169 paragraph Complaint with the United States District Court for the Northern District of Illinois (Case No. 09-CV-2984), against the ERISA Defendants, whom they identified as the Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plan, Patrick J. Moore, Paul K. Kaufmann, and John Does 1-20. VC ¶ 18; Dec. ¶ 9. A copy of the ERISA Complaint is attached as Exhibit A to the Debtors' Verified Complaint. Dec. ¶ 9.

In the ERISA Complaint, the ERISA Plaintiffs allege that the "Defendants breached their fiduciary duties owed to the Plans and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550." ERISA Complaint ¶ 2; VC ¶ 19; Dec. ¶ 10. They allege that, "As a result of these breaches, Defendants are liable to the Plans for all losses resulting from each such breach of fiduciary duty." ERISA Complaint ¶ 2; VC ¶ 19; Dec. ¶ 10. Plaintiffs also seek equitable relief and their attorneys' fees and expenses. ERISA Complaint ¶¶ 2, 169; VC ¶ 19; Dec. ¶ 10.

The ERISA Complaint levels a host of detailed allegations against the ERISA Defendants, essentially asserting in Count I that they had control over the assets of the various Plans that the Plaintiffs claim to represent, and that they violated their fiduciary duties by investing those assets in the Smurfit-Stone Container Corporation Common Stock Fund (the "Fund") from January 28, 2008, to the present even though by that point, according to the ERISA Plaintiffs, "the Plans' continued investment in the Fund was imprudent because the Fund was an excessively risky investment for retirement assets in light of the Company's dire and perilous financial condition." ERISA Complaint ¶ 3; see also ERISA Complaint ¶¶ 110-128; VC ¶ 20.

DB02:8321757.1

068063.1001

The ERISA Plaintiffs state with respect to Count II that their claims "arise out of SSCC's misrepresentations and failure to disclose material adverse facts concerning the Company's business conditions, debt management and viability." ERISA Complaint ¶ 4; <u>see also</u> ERISA Complaint ¶¶ 129-142; VC ¶ 21. "In particular," the ERISA Plaintiffs continue, "Defendants knew or should have known that the Company failed to disclose material adverse information regarding significant problems concerning the company's debt management, including the difficulties that SSCC was experiencing in renewing its revolving credit facilities which were required for the company's day-to-day operations." ERISA Complaint ¶ 4; VC ¶ 21. As a result, the ERISA Plaintiffs allege that they artificially inflated the value of Fund and SSCC's stock shares. ERISA Complaint ¶ 4; VC ¶ 21.

The ERISA Plaintiffs allege in Count III "that those Defendants who had a duty to appoint and monitor those fiduciaries with authority or control over the Plans' assets breached their duty to appoint and monitor." ERISA Complaint ¶ 6; <u>see also</u> ERISA Complaint ¶¶ 143-152; VC ¶ 22.

In Count IV, the ERISA Plaintiffs allege that the ERISA Defendants each have co-fiduciary liability because they "knew of the breaches by other fiduciaries and made no efforts . . . to remedy those breaches," ERISA Complaint ¶ 157, "participated in the management of the Plains' improper investment in the Fund and . . . knowingly participated in the improper management of that investment by the other Defendants," ERISA Complaint ¶ 159, and, by failing to monitor, "enabled [other] Defendants to breach their duties," ERISA Complaint ¶ 161. VC ¶ 23.

In each count, and throughout the ERISA Complaint, the allegations concern exactly what each of the ERISA Defendants knew or should have known of the Debtors'

DB02:8321757.1

068063.1001

declining financial health, when the Defendant knew it, his or her actions or failures to act with respect to that knowledge, and his or her motivations for those actions or failures to act. VC ¶ 24. The ERISA Plaintiffs' allegations are thus intensely fact specific, and undoubtedly, the ERISA Plaintiffs will seek extensive discovery regarding those facts, including broad requests for the production of documents, written interrogatories, and substantial deposition testimony. VC ¶ 14. In addition, the ERISA Plaintiffs' class allegations, concerning what the Plaintiffs allege to be a putative class of "at a minimum, thousands of members," ERISA Complaint ¶ 20, may separately need to be litigated, and even the question of who exactly is a defendant in the ERISA Lawsuit may require extensive discovery involving a broad swath of the Debtors' upper management and litigation in light of the ERISA Plaintiffs' "John Doe" designations. VC ¶¶ 26-27.

The ERISA Complaint does not state with specificity the damages that the ERISA Plaintiffs seek, but it repeatedly claims that "as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars in retirement savings," ERISA Complaint ¶¶ 127, 141, 151, 162, and that the Defendants "are liable to restore the losses to the Plans," ERISA Complaint ¶¶ 128, 142, 152, 163. VC ¶ 28. Thus, at a minimum, "millions of dollars" are at issue. VC ¶ 28; Dec. ¶ 11. The ERISA Plaintiffs also seek attorneys fees. ERISA Complaint ¶ 169; VC ¶ 28.

In point of fact, even though the ERISA Defendants would vigorously defend the allegations, "millions of dollars" may understate the amount in damages that the Plaintiffs seek. Given the number of shares in the Fund and the change in value over the alleged class period from January 28, 2008 to the present, the ERISA Plaintiffs potentially could be seeking many tens of millions of dollars. VC ¶ 29; Dec. ¶ 12.

DB02:8321757.1                                                          068063.1001

## BACKGROUND OF THE DEFENDANTS

The Defendants in the ERISA Lawsuit all are officers or senior executives of the Debtors and include the Debtors' CEO and each member of the Administrative Committee (the "Administrative Committee") that administers the Plans. VC ¶ 30; Dec. ¶ 13. Named ERISA Defendant Patrick J. Moore is Chairman of the Board and CEO of SSCC. VC ¶ 31; Dec. ¶ 13. Paul K. Kaufmann is a Senior Vice President and the Corporate Controller of SSCC. VC ¶ 31; Dec. ¶ 13. Both are corporate officers, and Mr. Kaufmann is a member of the Administrative Committee. VC ¶ 31; Dec. ¶ 13. The "John Does," whom the ERISA Complaint identifies as "other SSCC or SSCE employees and/or members of the Committee who exercised authority or control over the Plans and/or over the Plans' investments," ERISA Complaint ¶ 18, presumably include Ron Hackney and Brian Gardner, the remaining current members of the Administrative Committee. VC ¶ 31; Dec. ¶ 13. Mr. Hackney is a corporate officer, and Mr. Gardner is a senior executive. VC ¶ 31; Dec. ¶ 13.

The Defendants are each fully indemnified by the Debtors with respect to their activities and good-faith decisions or actions on behalf of the Administrative Committee or as otherwise relating to the administration or operation of the Plans. VC ¶ 32; Dec. ¶ 14. The Plans named in the ERISA Lawsuit, which are attached as Exhibits B, C, D, and E[3] to the Verified Complaint, all include the identical indemnification provision. VC ¶ 32; Dec. ¶ 14. This provision states that:

> To the maximum extent permitted by law, no member of the
> Administrative Committee shall be personally liable by reason of

---

[3] Exhibit B is the Smurfit-Stone Container Corporation Savings Plan; Exhibit C is the Jefferson Smurfit Corporation Hourly Savings Plan; Exhibit D is the Smurfit-Stone Container Corporation Hourly Savings Plan; and Exhibit E is the St. Laurent Paperboard Hourly Savings Plan. VC ¶ 32; Dec. ¶ 14. For ease of reference to the actual Plan documents, certain amendments not germane to the indemnification issue discussed herein have been excluded. VC ¶ 32 n. 2; Dec. ¶ 14 n.2.

> any contract or other instrument executed by him or her or on his
> or her behalf in his or her capacity as a member of such
> Administrative Committee nor for any mistake of judgment made
> in good faith, and the Company shall indemnify and hold harmless,
> directly from its own assets (including the proceeds of any
> insurance policy, the premiums of which are paid from the
> Company's own assets), each member of such Administrative
> Committee and each officer, employee, or director of the Company
> to whom any duty or power relating to the administration or
> interpretation of the Plan or to the management and control of the
> assets of the Plan may be delegated or allocated, against any cost
> or expense (including counsel fees) or liability (including any sum
> paid in settlement of a claim with the approval of the Company)
> arising under any act or omission to act in connection with the
> Plan, unless arising out of such person's own fraud or bad faith.

Dec. ¶ 14; VC ¶ 32; VC Ex. B at 44-45, Ex. C at 38-39, Ex. D at 43, Ex. E at 44-45.

Moreover, SSCC's by-laws (the "By-Laws") also provide indemnification protection to officers and directors of the Company. VC ¶ 33; Dec. ¶ 15. The By-Laws state that the Company will indemnify:

> any person who was or is a party or threatened to be made a party
> to any threatened, pending or completed action suit or proceeding .
> . . by reason of the fact that such person is or was a director or
> officer of the Corporation, or is or was a director of officer of the
> Corporation serving at the request of the Corporation as a director,
> officer, trustee, administrator, employee, or agent of another
> corporation, partnership, joint venture, trust, employee benefit plan
> or other enterprise, against expenses (including attorneys' fees),
> judgments, fines and amounts (including attorneys' fees paid in
> settlement) actually and reasonably incurred by such person in
> connection with such action, suit or proceeding if such person
> acted in good faith and in a manner reasonably believed to be in or
> not opposed to the best interests of the Corporation . . . .

Dec. ¶ 15; VC ¶ 33; VC Ex. F at 15. This right of indemnification is subject only to a Board determination that the individual in fact "acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Corporation." Dec. ¶ 15; VC ¶ 33; VC Ex. F at 15.

DB02:8321757.1

068063.1001

Each ERISA Defendant, beyond his or her normal duties and his or her role on the Administrative Committee, is deeply involved in the formulation and development of the Debtors' business strategy and operations, and thus will play an integral role in the planning process for their emergence from bankruptcy, including the development of the plan of reorganization. VC ¶ 34; Dec. ¶ 16.

As noted, ERISA Defendant Patrick J. Moore is the Chairman and Chief Executive Officer. VC ¶ 35; Dec. ¶ 17. As the chief executive there is no person more integral to all aspects of the Debtors' operations and their current posture as debtors in the bankruptcy process. VC ¶ 35; Dec. ¶ 17. Mr. Moore has served as CEO for more than seven years. VC ¶ 35; Dec. ¶ 17. Prior to that time, he served as the Debtors' Chief Financial Officer. VC ¶ 35; Dec. ¶ 17. Among other things, Mr. Moore is particularly involved with the Debtors' finances and the financial planning that will form the backbone of any potential plan of reorganization. VC ¶ 35; Dec. ¶ 17. Additionally, as CEO he leads all aspects of strategic planning, including those areas connected to the debtors' operations and the bankruptcy process. VC ¶ 35; Dec. ¶ 17.

ERISA Defendant Paul K. Kaufmann's duties include oversight and management of the accounting and internal control functions throughout the Company, including tax, internal audit and external reporting. VC ¶ 36; Dec. ¶ 18. As a result of the bankruptcy filing, Mr. Kaufmann's duties have been significantly expanded to include oversight of the monthly and periodic bankruptcy accounting and reporting requirements for the multiple Debtor entities that are filed in the Bankruptcy Court and additional materials provided to certain of the Debtors' lenders and the U.S. Trustee. VC ¶ 36; Dec. ¶ 18. Mr. Kaufmann is also involved in overseeing the administrative and tax claims processes to ensure payments are made as required, and he is

part of the critical finance team involved in determining the appropriate capital and tax structure to exit bankruptcy, including working with outside experts to determine the appropriate fresh start accounting upon exit from bankruptcy.  VC ¶ 36; Dec. ¶ 18.

Presumptive ERISA Defendant Ron Hackney is the Debtors' Sr. Vice-President Human Resources, an officer of the Company, and a member of the Administrative Committee. VC ¶ 37; Dec. ¶ 19.  His duties include the oversight and management of all HR, labor, benefits and compensation matters within the entire organization.  VC ¶ 37; Dec. ¶ 19.  These duties include, for example, in 2009 alone, providing oversight for some 54 sets of collective bargaining negotiations at the Debtors' various locations throughout the U.S. and Canada.  VC ¶ 37; Dec. ¶ 19.  In addition to his normal workload, Mr. Hackney now must focus much of his time specifically on the bankruptcy and reorganization process, including strategic decisions related to layoffs, severance plan and incentive plan issues, labor issues, pension plans and plant closings.  VC ¶ 37; Dec. ¶ 19.  These are all areas of vast import in the Debtors' attempt to successfully reorganize.  VC ¶ 37; Dec. ¶ 19.  As an indication of the importance of these issues to these bankruptcy proceedings, two members of the Committee are The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and the Pension Benefit Guaranty Corporation.  VC ¶ 37; Dec. ¶ 19.

Presumptive ERISA Defendant Brian Gardner is the Debtors' Director of Corporate Finance and Pension Investments and a member of the Administrative Committee. VC ¶ 38; Dec. ¶ 20.  Mr. Gardner is responsible for monitoring the Debtors' compliance with their DIP Financing agreement on a monthly basis as well as providing all DIP Financing-related reporting requirements on a weekly/monthly basis.  VC ¶ 38; Dec. ¶ 20.  He is also working closely with the Debtors' advisors to determine the appropriate capital structure for the Debtors'

exit from bankruptcy as well as monitoring capital markets and the Debtors' ability to raise new funds in conjunction therewith. VC ¶ 38; Dec. ¶ 20. Mr. Gardner also is responsible for oversight of the Debtors' cash position investment and determining the appropriate use of cash, including monitoring all of the Debtors' defined benefit and defined contribution plan investment managers. VC ¶ 38; Dec. ¶ 20. He has additionally been charged with supporting the Debtors' bankruptcy advisors in all areas of treasury management. VC ¶ 38; Dec. ¶ 20.

**BACKGROUND OF RELIEF REQUESTED**

At this crucial point during the Debtors' bankruptcy proceedings, the ERISA Defendants are, and must be, devoting all of their energies toward ensuring the Debtors' successful reorganization. VC ¶ 39; Dec. ¶ 21. It is a complex endeavor. VC ¶ 39; Dec. ¶ 21. With massive manufacturing operations spanning North America, restructuring the Debtors' businesses will require the intense and coordinated efforts of all of the Debtors' officers and senior executives, including the ERISA Defendants and many others as well. VC ¶ 39; Dec. ¶ 21. Anything that materially interferes with the ERISA Defendant' ability to attend to the Debtors' restructuring will necessarily thwart the Debtors' reorganization efforts. VC ¶ 39; Dec. ¶ 21.

In addition, the Debtors must protect their estates' assets for the benefit of all creditors in these cases. The automatic stay of Bankruptcy Code Section 362(a) (the "Automatic Stay") is designed in part to "protect the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equitably among the creditors." Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991) (quoting Martin-Trigona v. Champion Fed. Sav. & Loan Assoc., 892 F.2d 575, 577 (7th Cir. 1989)). Although nominally against the ERISA Defendants, the assets ultimately at stake in the ERISA Lawsuit belong to the estates of the

Debtors. VC ¶ 40; Dec. ¶ 22. Under the By-Laws and the terms of the Plans, the Debtors are obligated to indemnify each of the ERISA Defendants in full for their actions with respect to the Plans, and any potential insurance coverage may be insufficient to protect the Debtors' assets from damages resulting from the ERISA Lawsuit that may reach the tens of millions of dollars. VC ¶ 40; Dec. ¶ 22.

The Debtors do maintain three fiduciary insurance policies, a primary policy through Axis Insurance Company, with a $10,000,000 aggregate coverage maximum and a $100,000 deductible per claim, (the "Primary Policy"), an excess policy through Chubb that adds $10,000,000 to the available aggregate coverage (the "Chubb Policy") and a second excess policy through Navigators Insurance Company that adds $5,000,000 more in aggregate coverage (the "Navigators Policy"). VC ¶ 41; Dec. ¶ 23. Pursuant to the terms of the Primary Policy, which is attached as Exhibit G to the Complaint, this coverage extends to the Debtors and any individuals who are past, present, or future directors, officers, or trustees of the Debtors or of a Plan, in their fiduciary or administrator capacity, with respect to a violation of any "of the responsibilities, obligations or duties imposed on Fiduciaries by ERISA" or "any matter claimed against [any of them] by reason of his, her or its status as a fiduciary." VC ¶ 41; Dec. ¶ 23. Even assuming that this coverage would apply to any losses in the ERISA Lawsuit,[4] however, the total aggregate maximum coverage of the three policies added together would be limited to $25,000,000—much less than what the ERISA Plaintiffs potentially are seeking. VC ¶ 42; Dec. ¶ 24. And even if the "millions of dollars" ERISA Plaintiffs say they are seeking do not exceed the aggregate insurance limits, whatever the number of "millions" that are involved would

---

[4] To date, no insurance coverage has been confirmed under any of these policies with respect to the ERISA Lawsuit. VC ¶ 41 n. 3.

substantially diminish the aggregate insurance funds available to the Debtors in the event of other eligible claims.  VC ¶ 43; Dec. ¶ 24.

Recognizing the interference that defending the Lawsuit would cause to the Debtors' reorganization efforts and the functional and financial identity between the ERISA Defendants and the Debtors, with this Motion the Debtors seek injunctive relief extending the Automatic Stay through the provisions of Sections 362(a) and Section 105(a) of the Bankruptcy Code to enjoin the ERISA Lawsuit and any further proceedings against the ERISA Defendants.

## DISCUSSION

Section 362(a)(1) of the Bankruptcy Code provides, in pertinent part that, the filing of a petition "operates as a stay, applicable to all entities, of . . . the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor ."  11 U.S.C. § 362(a)(1).  Bankruptcy Code section 105(a) empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

The Automatic Stay, by its terms, directly applies only to the debtors.  See, e.g., McCartney v. Integra Nat'l Bank, North, 106 F.3d 506, 509 (3d Cir. 1997).  Nonetheless, courts widely recognize that even though non-debtor third parties "do not fall within the protection of the automatic stay, at times section 105 must be invoked on their behalf to prevent creditors from frustrating an otherwise-viable reorganization effort by pursuing actions against them."  Calpine Corp. v. Pogo Producing Co. (In re Calpine Corp.), 2007 WL 1302604 (Bankr. S.D.N.Y. April 30, 2007); see, e.g., McCartney, 106 F.3d at 510 ("This prohibition [against applying the stay to non-debtors] . . . has been liberalized in a number of cases where courts have applied the automatic stay protection to nondebtor third parties."); Gillman v. Continental Airlines (In re Continental Airlines), 177 B.R. 475, 479 (D. Del. 1993) ("Consistent with congressional intent

16

and with the fundamental purposes underlying the automatic stay, numerous federal courts have

held that, under appropriate circumstances, the automatic stay may be extended beyond direct

actions against the debtors to lawsuits against non-debtors"); In re Metro Transp. Co., 64 B.R.

968, 973 (Bankr. E.D. Pa. 1986) ("it is quite clear that, even where an automatic stay, per 11

U.S.C. § 362(a), is not in place, a bankruptcy court may, in its discretion, grant a stay pursuant to

11 U.S.C. § 105(a)").

> Courts in this Circuit and elsewhere understand that:
>
> The extension of the automatic stay to actions involving
> nondebtors furthers Congress' intentions in enacting § 362(a). The
> automatic stay was meant to cease creditor collection efforts of
> antecedent debts, to protect assets of the debtor's estate, to provide
> for equitable treatment of all creditors and to ensure successful
> reorganization efforts. [Based on consideration of these policy
> reasons, the automatic stay has been extended] to proceedings
> "against non-debtors where such actions would interfere with,
> deplete, or adversely affect property of the [debtors'] estates or
> which would frustrate the statutory scheme of Chapter 11 or
> diminish [debtors'] ability to formulate a plan of reorganization."

W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 2004 WL 954772 at *2 (Bankr. D.

Del. April 29, 2004) (quoting In re Global Indus. Technologies, 303 B.R. 753, 763 (Bankr. W.D.

Pa. 2004) (quoting In re Johns-Manville Corp., 26 B.R. 420, 423 (Bankr. S.D.N.Y. 1983), *aff'd*

40 B.R. 219 (S.D.N.Y. 1984)).

I.   **THE CIRCUMSTANCES WARRANT EXTENSION OF THE AUTOMATIC STAY TO THE ERISA DEFENDANTS.**

Courts evaluating whether to extend the automatic stay to non-debtor third parties

examine whether "unusual circumstances" warrant such extension. See McCartney, 106 F.3d at

510 (citing A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)). Under this

"unusual circumstances" test, "Two factors courts generally use to determine whether an

injunction seeking to expand the protections of the automatic stay to nondebtor parties under §

105(a) is appropriate are: (1) whether the nondebtor and debtor share an identity of interest such that a suit against the nondebtor is essentially a suit against the debtor and (2) whether the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization". W.R. Grace & Co. v. Chakarian (In re W. R. Grace & Co.), 386 B.R. 17, 30 (Bankr. D. Del. 2008); accord, Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.), 115 Fed. App'x. 565, 570 (3d Cir. 2004) ("The standard for the grant of a stay is generally whether the litigation 'could interfere with the reorganization of the debtor,' . . . or 'would interfere with, deplete or adversely affect property of the estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization.'") (citations omitted); In the Matter of Rickel Home Centers, Inc., 199 B.R. 498, 500 (Bankr. D. Del. 1996) ("controlling law" is that "the automatic stay may be extended beyond direct actions against the debtor to lawsuits against non-debtors where an identity of interests exists between the debtor and the non-debtor defendants such that the debtor is the real party defendant and the litigation will directly affect the debtor and, more particularly, the debtor's assets or its ability to pursue a successful plan of reorganization under Chapter 11"); Continental Airlines, 177 B.R. at 479 (same); see also McCartney, 106 F.3d at 510.

Under either of these prongs of analysis, the level of identity between the non-debtor defendants and the debtors and whether the litigation will affect the debtor's ability to pursue a successful plan of reorganization, it is evident that "unusual circumstances" exist in this case. Accordingly, Debtors seek extension of the automatic stay to the ERISA Defendants.

A.    **The Debtors Are The Real Party In Interest.**

It is well established that indemnification obligations can make debtors the real party in interest in litigation nominally against non-debtor third parties. Indeed, "The automatic stay has generally been extended to the 'unusual situation' where an action against one party is

essentially an action against the bankruptcy debtor, as in the case where a third-party is entitled to indemnification by the debtor for any judgment taken against it." In re W.R. Grace, 2004 WL 954772 at *2 (Bankr. D. Del. April 29, 2004) (citing cases); see also, e.g., McCartney, 106 F.3d at 510; In re Am. Film Techs., Inc., 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying prosecution of wrongful discharge claims against former and present directors of debtor because of debtor's indemnification obligations and its possible exposure to collateral estoppel prejudice); In re Family Health Servs., Inc., 105 B.R. 937, 942-43 (Bankr. C.D. Cal. 1989) (staying collection actions against nondebtor members of debtor HMO because judgments against nondebtors would trigger claims for indemnification from the debtor HMO).

In this case, the Debtors have fully indemnified each and every ERISA Defendant against potential personal liability for any actions taken, or judgments made in good faith, in their capacity as members of the Administrative Committee or otherwise in connection with their administration or control of the pertinent Plans. The only exceptions are for "such person's own fraud or bad faith," neither of which are even alleged against any ERISA Defendant in the ERISA Complaint.[5] That Complaint, instead, places any potential liability by the Defendants squarely within the scope of the Debtors' indemnification obligations.

At its core, the ERISA Complaint second guesses the ERISA Defendants' actions and statements in relation to their administration of the Plans. Alleging a breach of the fiduciary duty to prudently and loyally manage Plan assets, the ERISA Complaint asserts that, "these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plans, but was, instead, an imprudent investment in light of the Company's

---

[5] In the By-Laws, the standard is similar. They provide indemnification to any officer or director "if such person acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Corporation." VC Ex. F at 15.

material undisclosed fundamental weaknesses and the excessive risk associated with an investment in SSCC stock." ERISA Complaint ¶ 114. Alleging a breach of the duty to provide complete and accurate information, the Complaint states that the ERISA Defendants failed "to provide complete and accurate information regarding the Company and Company stock . . ., and, generally, by conveying through statements and omissions inaccurate information regarding the soundness of Company stock, and the prudence of investing retirement contributions in the stock." ERISA Complaint ¶ 136. And alleging that CEO Patrick Moore breached his obligation to monitor fiduciaries, the ERISA Complaint alleges that Moore failed "at least with respect to the Plans' investment in Company stock, to properly monitor his appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of appointees' imprudent actions and inaction with respect to Company stock;" that he failed "to ensure that the monitored fiduciaries appreciated the true extent of Company's inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Company stock;" and that "to the extent any appointee lacked such information, [he failed] to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in the Fund." Complaint ¶ 150. With each count, the allegation is that one or more of the ERISA Defendants, acting in his or her capacity as a member of the Administrative Committee or otherwise having duties or powers relating to the Plans or their assets, made imprudent judgments or misleading statements, or engaged in other improper actions or omissions, all in connection with the

administration of operation of the Plans. Those, however, are precisely the types of claims that under the Plan documents and the By-Laws, the Debtors are required to indemnify.[6]

As a result, any judgment against the ERISA Defendants, including for attorneys' fees, will ultimately come "directly from [the Debtors'] own assets (including the proceeds of any insurance policy, the premiums of which are paid from the Company's own assets)." VC Ex. B at 44-45; Ex. C at 38-39; Ex. D at 43; Ex. E at 44-45; Dec. ¶ 26. As noted, the Debtors do maintain fiduciary insurance coverage, but the presence of such insurance does not alter the conclusion that the Debtors' "own assets" are at risk. Dec. ¶ 26. Not only do the indemnification provisions of the Plans make clear that the proceeds from these insurance policies belong to the Debtors, and are themselves part of the Debtors' assets, but it appears possible that the insurance may be insufficient to cover the Defendants' alleged liability, particularly if attorneys fees are awarded as Plaintiffs request. Dec. ¶ 26; VC ¶ 40.

---

[6] The broad scope of the Debtors' indemnity obligations distinguishes the circumstances in this case from, for example, the situation in Stanford v. Foamex L.P., No. 07-4225, 2009 WL 1033607 (E.D. Pa. April 15, 2009), in which the district court, without discussing jurisdictional issues, cf., Straney v. General Motors, No. 06-CV-12152-DT, 2006 WL 2911452 * 4 (E.D. Mich. Oct. 6, 2006) (where district court concluded "that it lacks jurisdiction to entertain GM's motion for a stay" in conjunction with claims against bankrupt Delphi Corporation, because "a request for relief of this nature should be sought in the bankruptcy court, not in the court were the non-bankruptcy matter is pending"), refused after one of the defendants in a pending ERISA suit sought bankruptcy protection to extend the automatic stay to that defendant's nondebtor trust manager and members of the defendant's benefits committee. The court reasoned in part that because the pertinent indemnification agreements expressly excluded liability for breaches of fiduciary duty and a breach of appropriate standards of conduct, and as "plaintiff's claims center[ed] on defendant's alleged breaches of fiduciary duties, [the debtor's] indemnification obligations may not be absolute." 2009 WL 1033607 at *2 n.9. Here, absent fraud or bad faith not even alleged in the Complaint, the Debtors' indemnity obligations are absolute. See e.g., W.R. Grace, 2004 WL 954772 at *4 (noting that where right to indemnity coverage is evident and admitted by the Debtors, fact that indemnity agreement "places certain limitations on the Debtors' obligation to indemnify . . . does not require a holding that the obligation is not absolute").

The Debtors have three fiduciary insurance policies, which, pursuant to the Primary Policy, insure the Debtors and any individuals who are past, present, or future directors, officers, or trustees of the Debtors or of a Plan, in their fiduciary or administrator capacity, with respect to a violation of any "of the responsibilities, obligations or duties imposed on Fiduciaries by ERISA" or "any matter claimed against [any of them] by reason of his, her or its status as a fiduciary." The maximum aggregate liability for all claims during the policy period under the Primary Policy is $10,000,000. The supplemental Chubb Policy and Navigator Policy increase this maximum aggregate liability by an additional $10,000,000 and $5,000,000, respectively, resulting in a total aggregate maximum during the policy period of $25,000,000. There is also a retention amount for each claim on the Primary Policy.[7] VC Ex. G; Dec. ¶ 23.

The ERISA Complaint does not state the precise level of damages that the Plaintiffs seek, but it repeatedly avers that "as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiff and the other Class members, lost millions of dollars in retirement savings," ERISA Complaint ¶¶ 127, 141, 151, 162 and that the Defendants "are liable to restore the losses to the Plans," ERISA Complaint ¶¶ 128, 142, 152, 163. Thus, at a minimum, "millions of dollars" are at issue. ERISA Plaintiffs also seek attorneys fees. Complaint ¶ 169. If Plaintiffs attempt to measure their alleged losses by looking at the difference in the value of shares invested in the Fund over the course of their asserted class

---

[7] It is unclear at this point what the amount of the retention would be. The standard retention under the Primary Policy is $100,000 per claim. Dec. ¶ 23. There are endorsements, however, that may change that amount. The retention may increase to $1,000,000 per claim, under an endorsement applicable to actions involving "Wrongful Acts" (as defined in the policy) involving the securities of the Company. Dec. ¶ 23. A separate endorsement, though, may eliminate the need for a retention payment, if the Company is unable to provide indemnification solely due to Financial Impairment (as defined in the policy). Dec. ¶ 23. This retention question is another potentially difficult issue that must be worked through by the Debtors in the handling of the ERISA Lawsuit. Dec. ¶ 23.

period, the Debtors' potential exposure could conceivably reach several tens of millions of dollars. VC ¶ 29; Dec. ¶ 12.

This is not a case, therefore, where, due to insurance and the "relatively modest size of the potential recovery . . . it is difficult to see how the Debtor would sustain any loss, much less one that would materially impair its reorganization." Charon Trading Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC), 399 B.R. 400, 417 (Bankr. D. Del. 2009). To the contrary, it appears that Plaintiffs may be seeking damage amounts well in excess of the Debtors' available insurance. And of course, any amounts not covered by insurance would redound ultimately to the Debtors. See Continental Airlines, 177 B.R. at 481 n.5 ("In the absence of insurance, Continental will be forced to shoulder these indemnity obligations itself, thereby directly impacting Continental's assets.")

Even if the Plaintiffs do not seek damages in excess of the Debtors' available insurance, the "millions of dollars" that they do seek would significantly deplete the aggregate coverage available to the Debtors under their insurance policies, leaving them bare against further possible exposure. See SN Liquidation, Inc. v. Icon Int'l, Inc. (In re SN Liquidation, Inc.), 388 B.R. 579, 584 (Bankr. D. Del. 2008) (holding that where insurance policy is "in the nature of estate property providing coverage for directors and officers as well as for the Debtors[,] [d]epletion of insurance proceeds which results from indemnification for defense costs would adversely affect the Debtors' estate"). The court in SN Liquidation extended the stay to encompass proceedings brought by Icon International against certain indemnified and insured officers of the debtors, whom Icon alleged "fraudulently misled Icon into advancing . . . $4.0 million [in exchange for a promise of future media advertising purchases from Icon] while knowing full well that Debtors were on the verge of bankruptcy and did not have the financial

23

ability to purchase advertising or to honor the indebtedness." 388 B.R. at 582. The court

explained that, in addition to potential collateral estoppel concerns:

> A more compelling reason for finding that the automatic stay
> applies relates to a critical tenet of bankruptcy, namely, a stay
> protects creditors from more diligent creditors and facilitates the
> equitable treatment of creditors. Mar. Elec. Co. v. United Jersey
> Bank, 959 F.2d 1194, 1204-05 (3d Cir. 1991). The Court expects
> the Debtors to treat all litigants equitably, and that is not possible if
> one litigant, i.e., Icon, proceeds with its lawsuit and as a result the
> Insurance is diminished while other litigants honor the stay.

Id. at 585. The same can be said of the potential diminishment of the insurance available to the

Debtors in these proceedings. Moreover, even if the indemnification provisions of the Plan

documents and By-Laws were deemed inapplicable in this case, the insurance would still apply

to the ERISA Defendants directly, subjecting the Debtors' available insurance to the same

diminishment. VC ¶ 44; Dec. ¶ 25. Allowing the ERISA Plaintiffs to proceed with the ERISA

Lawsuit thus could undermine the very tenets upon which the automatic stay is based.

Courts recognize that "the purpose of extending the stay to directors and officers

indemnified by the debtor must be consistent with the purpose of the stay itself, to 'suspend

actions that pose a serious threat to a corporate debtor's reorganization efforts.'" Uni-Marts, 399

B.R. at 400 (quoting Ochs v. Lipson (In re First Cent. Fin. Corp.), 238 B.R. 9, 19 (Bankr.

E.D.N.Y. 1999)). Here, the ERISA Lawsuit could do considerable damage to the Debtors'

estates and substantially threaten their reorganization efforts. The Debtors truly are, therefore,

the real party in interest for the ERISA Defendants in the ERISA Lawsuit, making extension of

the stay not only appropriate, but a necessity.

**B.** **Defending The ERISA Lawsuit Will Adversely Affect The Debtors' Ability To Reorganize.**

The ability successfully to reorganize depends not only on the preservation of a debtor's assets, but also on the skill and effort of those officers, directors, and employees of the Debtors charged with managing the business in bankruptcy and with developing a plan of reorganization. VC ¶ 48. Thus, it is well established that litigation "diverting critical management resources from the reorganization effort may constitute 'unusual circumstances' to justify extending the stay." Uni-Marts, 399. B.R. at 417.

Courts understand that participating in discovery and in other aspects of defending a civil lawsuit, particularly a complex class action such as the ERISA Lawsuit at issue in this case, requires time that would be better spent by the involved executives attending to the debtor's reorganization. Accordingly, for example, the District Court in Continental Airlines affirmed the extension of the automatic stay to a shareholder class action suit alleging breaches of fiduciary duty by directors and officers of the debtor Airlines, reasoning in part that:

> since the parties-defendant to these actions include various Continental officers and directors who are heavily involved in Continental's reorganization efforts and since discovery in those actions would impose burdens both on the directors and Continental, defense of these actions would substantially detract from the directors' reorganization efforts and would hinder Continental's ability to emerge successfully from bankruptcy under a confirmed plan of reorganization.

177 B.R. at 481. The same can be said of the Defendants in the ERISA Lawsuit.

Each of the ERISA Defendants is heavily involved in the Debtors' efforts to reorganize. Dec. ¶ 27; VC ¶ 50. CEO Patrick Moore is focused on financial and strategic planning and high-level analysis and decisions that must be made regarding the future of each part of the Debtors' businesses. Dec. ¶ 27. In addition to his normal responsibilities, Paul

Kaufmann is engaged in oversight of bankruptcy accounting and reporting requirements, as well serving as part of the finance team involved in determining the appropriate capital and tax structure to exit bankruptcy, a position that requires all of the time that he can give it. Dec. ¶ 27. Ron Hackney is responsible for the administration and oversight of the HR department that handles myriad issues related to the Debtors' workforce of over 21,000 employees. Dec. ¶ 27. His duties including confronting critical labor, employment and benefits issues that the Debtors faced outside of, and now in, bankruptcy, including such difficult and time-consuming issues as examining the potential need for layoffs and plant closings. Dec. ¶ 27. As noted, in 2009 alone, Mr. Hackney is responsible for providing oversight for some 54 sets of collective bargaining negotiations at the Debtors' various locations throughout the U.S. and Canada. Dec. ¶ 27. Brian Gardner, meanwhile, devotes his time to, among other things, overseeing compliance with the Debtors' DIP Financing reporting requirements and development of an optimal capital structure for the Debtors to exit bankruptcy. Dec. ¶ 27. This includes the critical task of monitoring the capital markets and evaluating the Debtors' ability to raise new funds for potential exit-related liquidity transactions. Dec. ¶ 27. In essence, each of the ERISA Defendants has taken on a full second set of bankruptcy-related responsibilities since the Petition Date. Dec. ¶ 27. Moreover, it would be difficult to identify duties any more central to the success of the Debtors' ability to emerge from bankruptcy than those performed by the ERISA Defendants.

None of these individuals can be spared by the Debtors to engage in discovery and other preparation necessary to properly defend the ERISA Lawsuit at this time. Dec. ¶ 28; VC ¶ 50. Discovery in the ERISA Lawsuit will undoubtedly be extensive and time-consuming. As noted, the ERISA Complaint is 49 pages long and includes four separate counts and 169 numbered paragraphs. The Plaintiffs seek certification of a class consisting of "all current and

former Participants in the Plans for who individual accounts the Plans held shares of SSCC common stock (directly and/or through shares of the Fund) from January 28, 2008 to the present." ERISA Complaint ¶ 19. By their admission, "Plaintiffs believe that there are, at a minimum, thousand of members of the Class." ERISA Complaint ¶ 20. And the allegations are deeply fact intensive, necessarily focusing on what each Defendant knew, at what point in time, and what, if anything, they did with that information, and what their motivations were. Presumably, Plaintiffs will demand the ERISA Defendants produce all pertinent documentation and that they be deposed, with a possibility of written interrogatories as well. All of which takes time the ERISA Defendants do not have to spare.

By any measure, the Debtors' bankruptcy is a complex undertaking, requiring the ERISA Defendants' full attention. SSCC is a Fortune 500 Company, and its bankruptcy is among the largest currently on file nationwide. Dec. ¶ 28. These jointly-administered cases consist of twenty-five (25) individual Debtors operating one of the leading paperboard and paper-based packaging manufacturers in North America, with significant cross-border operations and a complex capital structure. Dec. ¶ 28. Indeed, the size and complexity of the Debtors' cases is reflected in much of what has transpired in these proceedings to date. Dec. ¶ 29. The Debtors, largely through their executives, have focused substantial time and effort to stabilize their operations in a very difficult and uncertain economic environment while also ensuring a smooth transition into chapter 11. Dec. ¶ 29. In order to facilitate this smooth transition, and to help fund their restructuring, the Debtors obtained final approval of a $750 million in DIP Financing. Dec. ¶ 29. They have addressed cash management concerns, worked to garner the Committee's support for their severance and short- and long-term incentive plans, undertaken an analysis of executory contracts and leases and filed numerous motions seeking authority to reject

certain executory contracts and unexpired leases, worked diligently to identify potential cost savings that will assist in the development of a "go forward" business plan that will form the basis for a plan of reorganization, and satisfied all pertinent recording and reporting requirements. Dec. ¶ 29. In addition to addressing the myriad requirements and initiatives undertaken in these chapter 11 cases, the Debtors have also spent considerable time and expended extensive resources coordinating with the Cross-Border Debtors, Canadian professionals and the Canadian Court regarding the CCAA proceedings and the implementation of a cross-border insolvency protocol.[8] Dec. ¶ 29.

The efforts of the Debtors' executives have been, and will continue to be, all consuming as the Debtors explore their reorganization options and work with their stakeholder constituencies to develop a long-term plan of reorganization and a successful emergence. Dec. ¶ 30. As part of this massive effort, during the tenure of these cases, the ERISA Defendants will be at capacity, performing their respective duties ensuring the continued transition of the Debtors' business operations, developing the Debtors' ongoing business strategy, and working to negotiate and develop a plan of reorganization and with their advisors to help facilitate the ultimate plan of reorganization's submission and approval. Dec. ¶ 30. The ERISA Defendants are all essential to the Debtors' efforts, and their time and energy cannot be further siphoned off from their work on the Debtors' behalf in order to defend an outside lawsuit at this time. Dec. ¶ 30. If the ERISA Defendants were forced to attend to the ERISA Lawsuit during the pendency of these cases, there is little doubt that such diversion from their operational and restructuring

---

[8] For additional information concerning what has transpired in these proceedings to date, see the Motion For An Order Pursuant To 11 U.S.C. § 1121(D) Extending The Exclusive Periods Within Which The Debtors May File A Chapter 11 Plan And Solicit Acceptances Thereof [Docket No. 855], incorporated as appropriate herein.

duties would dangerously interfere with the Debtors' abilities successfully to reorganize, too great a risk in these complex chapter 11 cases where so much is at stake.  Dec. ¶ 30.

The Debtors' need for the ERISA Defendants' undivided attention, and the complexity and likely time demands of the ERISA Lawsuit, create precisely the sort of "unusual circumstance" that makes extension of the automatic stay appropriate.  See Johns-Manville Corp., 26 B.R. at 426; cf., Uni-Marts, 399 B.R. at 417 (refusing to extend stay to executive where action sought to be stayed had "limited scope" and "the Debtor's chapter 11 case [was] small and relatively straightforward").

## II. AN INJUNCTION IS ALSO WARRANTED UNDER TRADITIONAL INJUNCTION STANDARDS.

The Debtors respectfully request that in the alternative to extending the Automatic Stay through section 105(a) of the Bankruptcy Code under the "unusual circumstances" test, the Court issue a temporary restraining order and preliminary injunction pursuant to section 105(a) and traditional injunction standards.  Some courts have applied such  standards in conjunction with, or in place of,  the "unusual circumstances" test in determining the propriety of enjoining actions against non-debtor third parties.  See W.R. Grace & Co., 386 B.R. at 32 (discussing alternative views of appropriate standards).  To the extent these standards differ from the unusual circumstances test, however, or to the extent the Court deems the traditional standards to be the appropriate measure of whether to enjoin the Lawsuit, the facts in these proceedings readily satisfy the traditional standards as well.

Courts typically identify the following factors in deciding whether to grant a preliminary injunction:  "(1) likelihood that the plaintiff will prevail on the merits; (2) the extent of irreparable harm to Debtors; (3) the harm to [the plaintiff in the third-party action] if the injunction is granted and (4) the public interest."  SN Liquidation, 388 B.R. at 585.  Under

another formulation, slightly more tailored to bankruptcy, courts are to "consider whether the debtor has a reasonable likelihood of a successful reorganization, the relative hardship of the parties, and any public interest concerns if relevant." W.R. Grace, 386 B.R. at 33 (quoting In re Excel Innovations, Inc., 502 F.3d 1086, 1096 (9th Cir. 2007)).

**A.      There Is A Strong Likelihood The Plaintiffs Will Prevail On The Merits.**

As the second formulation of the injunction standards suggests, "likelihood of success" in the bankruptcy context means a consideration of whether the debtor seeking the injunction has a reasonable likelihood of a successful reorganization. W.R. Grace, 386 B.R. at 33 (citing Excel Innovations, 502 F.3d at 1096). As noted above, the Debtors have made significant strides in these early stages of their chapter 11 proceedings and are well on their way towards developing the business strategies and plans for such a reorganization. Dec. ¶ 31. They have obtained DIP Financing, addressed cash management concerns, worked with the Committee to implement appropriate severance and incentive plans and addressed certain cost-cutting needs, as detailed above. In fact, there has been not suggestion, to date, that the Debtors will not be able to successfully emerge from bankruptcy. In order to continue on their current path towards a successful reorganization, however, the Debtors will need all of their key executives focused on that goal, and not distracted by external factors such as the ERISA Lawsuit.

**B.      The Relative Hardship of the Parties Favors Granting The Injunction.**

Analyzing "the relative hardship of the parties" requires balancing the traditional question of "whether the debtor will suffer irreparable injury without the injunction" against "the harm to others which will occur if the injunction is granted." W.R. Grace, 386 B.R. at 33. For all of the reasons set forth above, there is no question that without the injunction, the Debtors will suffer irreparable harm. See Continental Airlines, 177 B.R. at 481 n.6 ("'In a bankruptcy

DB02:8321757.1                                                                                                    068063.1001

context, irreparable harm may be discerned if the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort.'") (quoting Sudbury, Inc. v. Escott, 140 B.R. 461, 465 (Bankr. N.D. Ohio 1992)). The harm to the ERISA Plaintiffs if their suit is enjoined, on the other hand, is less apparent. The delay that would result from an injunction is "no different from that suffered by any other creditor in a bankruptcy case whose state law claims or actions are delayed by the bankruptcy." W.R. Grace, 386 B.R. at 35. Any such harm to the ERISA Plaintiffs would be greatly outweighed by the harm to the Debtors, whose assets could be placed directly at risk and who now, more than ever, require the time and undivided attention of their key executives. In fact, there would be very little harm in staying the ERISA Lawsuit until after the Debtors' emergence from these cases, when it would be more likely to proceed on an expeditious pace with the full attention of the ERISA Defendants and the Company.

C.     **The Public Interest Would Be Served By Granting The Injunction.**

Under the "public interest" prong of the analysis, courts recognize that "there is a strong public interest in promoting a successful Chapter 11 reorganization." Rickel Home Ctrs., 199 B.R. at 501. The public interest, therefore, surely would be served by issuing an injunction, and just as surely be undermined if the injunction were denied.

## CONCLUSION

Under all of the facts and circumstances, Debtors respectfully submit that unusual circumstances exist in these proceedings that create ample justification to stay the ERISA Lawsuit against the ERISA Defendants, either through section 105(a) and the extension of the automatic stay provisions of section 362(a) of the Bankruptcy Code, or through a preliminary injunction under section 105(a). As set forth herein, the ERISA Lawsuit, if it proceeds, will directly threaten the assets of the Debtors' estates, consume the time and energy of certain key

31

senior executives involved in maintaining the Debtors' business operations and developing a plan of reorganization, and cause potentially irreparable harm to the Debtors' reorganization efforts.

For all of the foregoing reasons, the Debtors respectfully request that the Court grant their Motion for Temporary Restraining Order and Preliminary Injunctive Relief and enjoin the ERISA Lawsuit against the ERISA Defendants as defined herein and awarding such other relief as the Court deems appropriate.

DB02:8321757.1 068063.1001

Dated: Wilmington, Delaware
June 18, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Brian J. Gold
Matthew A. Clemente
Dennis M. Twomey
James D. Weiss
Bojan Guzina
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

ATTORNEYS FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION

DB02:8321757.1

068063.1001