IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

* * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| In re:<br><br>SMURFIT-STONE CONTAINER<br>CORPORATION, et al.,[1]<br><br>      Debtors.<br><br>SMURFIT-STONE CONTAINER<br>CORPORATION, et al,<br><br>      Plaintiffs,<br><br>      v.<br><br>MARK W. MAYER, LARRY C. WELSH<br>AND BRANDI YOUNG, INDIVIDUALLY,<br>ON BEHALF OF THE SMURFIT-STONE<br>CONTAINER CORPORATION SAVINGS<br>PLAN, THE JEFFERSON SMURFIT<br>CORPORATION HOURLY SAVINGS<br>PLAN, THE SMURFIT-STONE<br>CONTAINER CORPORATION HOURLY<br>SAVINGS PLAN, AND THE ST. LAURENT<br>PAPERBOARD HOURLY SAVINGS PLAN,<br>AND ON BEHALF OF ALL OTHERS<br>SIMILARLY SITUATED,<br><br>      Defendants. | Chapter 11<br><br>Case No. 09-10235 (BLS)<br><br>Jointly Administered<br><br>Adv. Pro. No. 09-51067 (BLS) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Service Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitee (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 122 North LaSalle Street, Chicago, Illinois 60601.

# REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiffs are the debtors and debtors-in-possession (collectively "Debtors"), and have moved to enjoin an action brought in federal District Court against Debtors' senior management, including the CEO, CFO, Controller and Vice-President of Human Resources (the "ERISA defendants") for Smurfit-Stone Container Corporation. That federal court action advances claims under ERISA on behalf of participants in various retirement plans sponsored by Debtors (the "ERISA action"). The ERISA action seeks to impose personal, multi-million dollar liability for breach of fiduciary duty on the ERISA defendants.

These bankruptcy proceedings are, as this Court is aware, approaching a critical period. Debtors' successful emergence from bankruptcy – an event of obvious significance to the employees of Debtors who comprise a significant portion of the putative classes in the ERISA action – requires the undivided attention of the ERISA defendants. Moreover, due to the indemnity and insurance obligations in place, it is the Debtors' resources that ultimately are at stake in the ERISA action. To assure that management is not diverted at a critical juncture in these proceedings, and to protect the assets of the estate, Debtors have moved to enjoin and stay the ERISA action.

The plaintiffs in the ERISA action ("the ERISA plaintiffs") oppose any such stay. None of their arguments seeking to proceed with the ERISA action, however, fairly meet the special facts and circumstances present here that support extension of the automatic stay and an injunction against the ERISA action. The law is clear: under the present facts extension of the stay is well warranted.

2

# ARGUMENT

## I. DEBTORS CORRECTLY APPLY THE UNUSUAL CIRCUMSTANCES STANDARD.

Numerous authorities – including cases cited in the briefs of both sides to this dispute – lay out the "unusual circumstances" test applicable to requests to extend the automatic stay to actions against non-debtors. The well established standard requires (1) an identity of interest between the non-debtor defendant in the action to be stayed and the debtor, and (2) that the action against the non-debtor will have an adverse impact upon a successful reorganization. *E.g., W. R. Grace & Co. v. Chakarian*, 386 B.R. 17, 30 (Bankr. D. Del. 2008); *In the Matter of Ricket Home Centers, Inc.*, 199 B.R. 498, 500 (Bankr. D. Del. 1996).

The ERISA plaintiffs claim to have identified an "emerging trend within the Third Circuit" requiring satisfaction of both the unusual circumstances test and the traditional elements underlying injunctive relief. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("ERISA Pl. Memo") at 6. This emerging "trend" is represented by a single case, *In re Philadelphia Newspapers, LLC*, 407 B.R. 606 (E.D. Pa. 2009). *Id.* One case does not a trend make, and the unusual circumstances test remains the relevant standard.

Even assuming that the *Philadelphia Newspapers* Court is a trendsetter – whose holding will one day be followed by other courts in this circuit – the multi-step process identified in *Philadelphia Newspapers* does not apply any materially different standard than the traditional unusual circumstances test. In *Philadelphia Newspapers* the debtor sought to extend the automatic stay to libel actions against its employees and certain affiliates. Based upon (1) the presence of indemnity obligations likely to be triggered by those claims, and (2) the need of the employees named as defendants to devote their full attention to the bankruptcy, the bankruptcy

3

court extended the automatic stay. The district court affirmed, after analyzing the action under a three-step process that the ERISA plaintiffs seek to apply here. 407 B.R. at 617-18. While using a three-step analysis the court pointed to the same two factors – indemnity and disruption of the bankruptcy – at each stage of the analysis. Those, of course, are exactly the principal factors identified by Debtors here.

The first step of the *Philadelphia Newspapers* analysis involves consideration of the bankruptcy court's jurisdiction. *Id.* at 614-15.[2] The court found "related to" jurisdiction because of, *inter alia*, indemnity obligations and the impact on reorganization from the competing demands on the Debtors' management should the libel action proceed. 407 B.R. at 613-14. These same factors were then applied in the unusual circumstances analysis. *Id.* at 616.

The third phase of the analysis in *Philadelphia Newspapers* – applying the standards for injunctive relief – likewise added little to the unusual circumstances test. The factors that tipped the scales in support of extending the automatic stay under the unusual circumstances test – step two of the court's analysis – were also the primary determinants under the injunctive relief analysis. *Id.* at 617 (finding distraction of key employees from tasks needed in connection with bankruptcy satisfied irreparable harm element of injunctive relief and also tipped equities in favor of grant). The possible indemnity obligation of the debtor coupled with the diversion of key employees justified the modest delay in the state law litigation against those employees that resulted from an injunction of the libel action and the extension of the automatic stay. *Id.*

In short, *Philadelphia Newspapers* reached the same result – and for precisely the same reasons – as it would have applying only the traditional unusual circumstances test. That opinion ultimately supports Debtors' motion, as the ERISA defendants encompass a broader section of

---

[2] The ERISA plaintiffs do not challenge the jurisdiction of this Court to grant the relief requested.

DB02:8873171.1　　068063.1001

management than was the case in *Philadelphia Newspapers*, and the threat of diversion is more substantial here.

## II. THERE IS NO IMPROPER ATTEMPT TO USE THIS BANKRUPTCY TO SHIELD DEBTORS' MANAGEMENT.

The ERISA plaintiffs argue that Debtors' management should not be able to evade "**all civil prosecutions of their individual fraudulent acts by having the corporation file a bankruptcy proceeding.**" ERISA Pl. Memo at 10 (emphasis in original) quoting *Duval v. Gleason*, No. C-90-0242, 1990 WL 261364 at *4 (N.D. Cal. Oct. 19, 1990). There is not a shred of support for the assertion that this multi-party, multi-jurisdictional bankruptcy was brought to shield Debtors' management from liability for the ERISA action. Indeed, the assertion is absurd on its face. The ERISA plaintiffs' policy argument – seeking to preclude use of "unusual circumstances" extension of the automatic stay based on the claim that Debtors' management have induced a bankruptcy filing to advance their personal agenda – can be rejected out of hand. Far too many people and too many issues and dollars are at stake worldwide for this bankruptcy to be merely an attempt to shield the ERISA defendants. Moreover, as the Court is aware, the bankruptcy is reaching a critical stage toward resolution – after which, in a matter likely of months, the automatic stay will be lifted and any purported "shield" will disappear. The ERISA plaintiffs' suggestion and innuendos about the Debtors' motives are baseless.

## III. THE UNUSUAL CIRCUMSTANCES STANDARD IS SATISFIED.

### A. The Right To Indemnity Is Not Open To Serious Dispute.

The ERISA plaintiffs argue that Debtors' duty to indemnify the ERISA defendants is contingent and thus cannot establish a sufficient identity of interest such that the ERISA action is a suit against the Debtors. ERISA Pl. Memo at 12-15. There is, however, no genuine dispute that the broad indemnity provisions at issue here apply to the claims advanced by the ERISA

DB02:8873171.1

068063.1001

plaintiffs. *See* Debtors' Opening Memorandum at 19-21. While the ERISA plaintiffs label the rights contingent, they make no attempt to present any circumstances under which the ERISA action could generate a judgment in favor of the ERISA plaintiffs that is not subject to the unambiguous terms of the indemnity provisions. Indeed, the ERISA plaintiffs neither seek nor desire such an outcome: they have every incentive to bring the assets of the Debtors (and their insurers) to the table. Moreover, the indemnity obligations extend to defense costs, meaning even a defense victory in the ERISA action will generate indemnity obligations. It is disingenuous for the ERISA plaintiffs to suggest there is any genuine issue regarding the applicability of the indemnity obligations.

The ERISA plaintiffs cite to actions where the presence of indemnity obligations was found insufficient to satisfy the first prong of the unusual circumstances test, requiring a sufficient identity of interest between the debtor and the non-debtor defendant in the action to be stayed. ERISA Pl. Memo at 13-15. But this is hardly surprising: Debtors never claimed there was a *per se* rule. The particular facts in each case are critical. And, of course, the extension of the stay is discretionary. Here, the facts are more than adequate to justify this Court's exercise of its discretionary authority in favor of granting the relief sough. Indeed, as a practical matter, the duty to indemnify may not be the most important consideration in evaluating whether there is an identity of interest between Debtors and the ERISA defendants. The ERISA litigation advances claims that Smurfit-Stone's CEO and other senior executives breached fiduciary duties to Debtors' employees. These claims present issues that are critically important to the Debtors, regardless of the names on the defendants' portion of the caption, and the unusual circumstances test is met under these facts.

B.  **The Insurance Policies Can Provide Proceeds To Debtors.**

The ERISA plaintiffs argue that the fiduciary insurance policies are not property of the Debtors' estate – and hence cannot support a finding of unusual circumstances – because Debtors do not have any right to receive proceeds. ERISA Pl. Memo at 16. Rather, they argue that "upon a finding of liability or a settlement of the ERISA litigation, the insurance proceeds will flow directly to the Plans and/or to the Non-Debtor Defendants themselves for legal fees, thereby protecting the Debtors from indemnification claims." *Id.* at 18. But the policy provides direct coverage to the Debtors for any amount they are obligated to pay in indemnity of any covered claim. (Exh. G to Adversary Complaint, p. 4 of 14) Moreover, it is not "conjecture" that payment under the policies for the ERISA claims will diminish insurance available to protect Debtors against other claims, as the ERISA plaintiffs argue. ERISA Pl. Memo at 18. This is the nature of the insurance, which has coverage limits. Whether there will be any other claims that trigger the policies is, of course, unknown. But protection against possible claims is the reason that insurance is purchased. Depletion of available insurance limits directly reduces the present assets of Debtors.

IV. **THE ERISA LITIGATION WILL IMPAIR DEBTORS' ABILITY TO FORMULATE AND EXECUTE A PLAN OF REORGANIZATION.**

The ERISA plaintiffs argue that their lawsuit – which has been fast-tracked with a five-month discovery close date – will impose no meaningful burden on the ERISA defendants, upon whom the ERISA plaintiffs seek to impose multi-million dollar personal liability for breach of fiduciary duty. The ERISA plaintiffs assert that everything will be handled by the lawyers, and that the ERISA defendants will need do little if anything beyond sit for a one-day deposition. ERISA Pl. Memo at 23-24. This argument is factually baseless.

The ERISA action second-guesses the decision to include company stock as an option in retirement plans over an extended period of time. The scope of the facts in issue is shown by the ERISA complaint. (*See* Debtors' Opening Memorandum at 7-9) This broad scope was reinforced by the ERISA plaintiffs' first-wave of document requests. The ERISA plaintiffs claim these requests seek a discrete and limited amount of materials. ERISA Pl. Memo at 22. They do not. For example, the requests seek:

> 15. All documents, including any evaluation, analysis, discussion, report, or communication, presented or available to, or prepared or reviewed by the SSCC or SSCE Board of Directors, the Committee or any Defendant concerning: the likelihood and potential timing of Smurfit's bankruptcy; Smurfit's transformation strategy; Smurfit's capital or debt structure; Smurfit's Z-score; Smurfit's debt-equity ratio; Smurfit's credit and/or liquidity rating(s); possible or actual reductions in the scope of Smurfit's business and operations, including without limitation plant closings or employee layoffs; the potential or actual impact if changes in the national and global credit markets on Smurfit's business and operations; deteriorating demand for Smurfit products; and/or Smurfit's ability to secure financing.
>
> 16. All documents concerning the risks or actual or potential effects (or the evaluation or assessment of the risks or effects) on Smurfit's business, financial condition, performance or stock price of any of the following: the likelihood and potential timing of Smurfit's bankruptcy; Smurfit's transformation strategy; Smurfit's capital or debt structure; Smurfit's Z-score; Smurfit's debt-equity ratio; Smurfit's credit and/or liquidity rating(s); possible or actual reductions in the scope of Smurfit's business and operations, including without limitation plant closing or employee layoffs; the potential or actual impact of changes in the national and global credit markets on Smurfit's business and operations; deteriorating demand for Smurfit products; and/or Smurfit's ability to secure financing.
>
> 17. All documents concerning financial forecasts, financial projections, proposed corporate restructurings, or potential or actual restructuring or bankruptcy or other documents concerning Smurfit's project financial condition or performance made available, or provided to, prepared or reviewed by one or more Defendants.

DB02:8873171.1    068063.1001

Exhibit 1 hereto.

These requests, as drafted, are all-encompassing. They seek virtually any document that relates in any way to the performance of any of the Debtor entities for a defined "Relevant Time Period" from January 1, 2008 to the present. *Id.*, Definition 21. Counsel for the ERISA plaintiffs – at the 30(b)(6) deposition of Debtors – attempted to significantly limit the requests in apparent recognition of their over-breadth. Before asking the witness to estimate the volume of materials responsive to these requests, he modified the requests to seek only documents "circulated among the [Debtors'] operating committee" of senior management, a limit found nowhere in the requests. (Deposition at 35 and 37) Even with this limit – which has not been adopted in the ERISA litigation – the first wave of discovery seeks an extremely voluminous amount of materials. (*Id.* at 36-38)

The ERISA plaintiffs assert that the ERISA defendants will not likely play a substantial role in document retrieval. But Debtors' concern about the diversion of the attention of the ERISA defendants was never predicated on the belief that any of them would be spending hours combing through boxes of paper. Rather, these busy players in the bankruptcy will, of necessity, be involved in formulating strategy in defense of the ERISA litigation and each, undoubtedly, will be deposed. Preparation for these depositions will be substantial and will require a renewed and thorough familiarity with the contents of those files and boxes that others are searching for them.

The ERISA defendants will need be ready to recall the facts reasonably known to them at each point during the two-year "Relevant Time Period." They will need be prepared to explain the reasonable conclusions they reached – again at each point over this extended period of time – as to issues as diverse and complex as Debtors' financing needs, Debtors' ability to meet various

projections, and the market for their products. In short, the ERISA defendants will need to be conversant in all material facts and circumstances affecting the business of a large multinational enterprise so as to allow a full response to the serious fiduciary duty charges leveled personally against each.

These depositions will proceed during a critical phase of this bankruptcy. As the Debtors have informed the Court, they intend to file a plan of reorganization in the near term. In fact, a plan termsheet has been provided to the Unsecured Creditors' Committee (the "Committee") and certain other creditor constituencies. The Debtors' plan of reorganization will be extremely complex, as the Debtors' cases are multi-faceted and multinational in scope and involve billions of dollars in claims. Circulation of the plan termsheet has sparked negotiations and analysis which requires the continued, uninterrupted focus of the Debtors' management at this time.

There are many competing interests involved in the Debtors' cases and now that a plan termsheet has been circulated, there are extensive and active negotiations with those parties that require the ERISA defendants' full and uninterrupted attention. For example, there are discussions required with the Monitor for the Cross-Border Debtors in order to address the myriad issues confronting the Debtors in Canada. Additionally, there are ongoing discussions with the Committee, whose interests are diverse and include the PBGC, the Untied Steelworkers and several indenture trustees and trade creditors. And, most recently, an *ad hoc* committee of equity holders began pressing for the formation of an official committee. Each of these interests requires the ERISA defendants' attention and focus in order to provide analysis, implement strategy and engage in negotiations designed to achieve the best possible outcome for those constituencies that are in the money. Any error resulting from a lack of focus by management

distracted by other legal proceedings could have a substantial and meaningful impact on creditors, including through timing delays and value erosion.

Moreover, as the plan process blossoms and becomes increasingly public, the ERISA defendants will need to focus on maintaining cooperative and productive business relationships with the Debtors' numerous customers, brokers, vendors and trade partners, not to mention the over 20,000 employees. This takes focus and coordination by the management team to ensure that a seamless and appropriate message is communicated to those constituencies who will form the backbone of the Debtors' future upon exit from bankruptcy.

The size of Debtors' bankruptcy counsel's firm does nothing to minimize the burdens imposed on management, contrary to the assertion of the ERISA plaintiffs. ERISA Pl. Memo at 20. As the Debtors move toward filing a plan of reorganization, the Debtors' counsel is diligently working on a disclosure statement and other plan-related documents. Both input and review from the ERISA defendants – who include Debtors' CEO and CFO – is critical to craft complete and accurate documents, and such documents are of utmost importance to the Debtors' plan of reorganization and their ability to exit successfully from bankruptcy. These disclosure documents and the plan of reorganization will govern the go-forward business structure of the Debtors after emergence from Chapter 11 protection. Senior executive input and decisions are key to formulating these plans and documents and full participation from the Debtors' executives and management is essential. Indeed, the ERISA defendants will be more than merely "working hard" during the plan process; they are essential as the Debtors move through the most vital state of their overall reorganization.

## V. THE REQUIREMENTS FOR AN INJUNCTION ARE MET.

Assuming for the sake of argument that the requirements for injunctive relief are also needed, they are met.[3] Indeed, as already noted, the facts here are materially indistinguishable from the facts in *In re Philadelphia Newspapers, LLC*, 407 (B.R. 616 (E.D. PA. 2009), upon which the ERISA plaintiffs rely for their claim that Debtors need meet the standards for an injunction. The distraction of employees central to the bankruptcy was there sufficient to establish imminent, irreparable harm. 407 B.R. at 617. The potential distraction of the core of senior management here is similarly dispositive. The *Philadelphia Newspapers* court held that the potential harm to the reorganization efforts more than offset the slight harm caused by a temporary stay of the third-party litigation. *Id.* So, too, the balance of harms here tips in favor of Debtors; a short delay of the ERISA action presents little harm while interference with the bankruptcy at this critical phase may cause significant damage.[4] Finally, "the public interest in a successful bankruptcy reorganization" trumped any countervailing interest in *Philadelphia Newspapers*. *Id.* This is even more the case here, as a successful reorganization is of great value not only to the public but to the very persons supposedly represented by the ERISA plaintiffs: Debtors' employees. Indeed, those employees have a greater interest in seeing Debtors successfully emerge from bankruptcy than they have in avoiding a short delay of the ERISA litigation.

## **CONCLUSION**

For all of the reasons stated herein and in their Complaint and Opening Memorandum, he Debtors respectfully request that the Court grant their Motion for Temporary Restraining order

---

[3] The ERISA plaintiffs do not dispute that Debtors have established a likelihood of successful reorganization, the first element.

[4] The ERISA plaintiffs' claim of potential lost evidence and fading memories adds nothing to this equation. A delay here will likely be measured in months

12

and Preliminary Injunctive Relief and enjoin the ERISA lawsuit against the ERISA defendants and award such other relief as the Court deems appropriate.

Dated: October 28, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Brian J. Gold
David B. Johnson
Matthew A. Clemente
Dennis M. Twomey
James D. Weiss
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

and -

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION